UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:18-cv-24250-COOKE/GOODMAN

AARON TIMBERLAKE,

        Plaintiff,

vs.

CARNIVAL CORPORATION,
a foreign for profit corporation,

        Defendant.
_____/

# DEFENDANT, CARNIVAL CORPORATION'S
# MOTION FOR SUMMARY JUDGMENT

      Pursuant to Rule 56, Fed. R. Civ. P. and S.D. Fla. L.R. 56.1, Carnival Corporation ("Defendant" or "Carnival") moves for summary judgment against Aaron Timberlake ("Plaintiff") on all six (6) counts set forth in Plaintiff's Complaint (ECF No. 1). In support of this Motion, Defendant states as follows:

**I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT**

      The facts giving rise to this lawsuit are straightforward. Plaintiff, who was hired by Defendant as a shipboard Professional Disc Jockey ("Pro DJ"), failed to disclose and flatly misrepresented to Defendant that he had suffered from a severe psychotic episode and been hospitalized for psychiatric reasons in the past, both in connection with his pre- (2012) and post- (2014) employment medical exams. In May 2015, Plaintiff suffered a further severe psychotic episode while working aboard the Carnival Freedom, requiring that medical staff and security personnel restrain, sedate, and then render care to prevent him from harming himself, other crew members, and/or passengers until the ship's return to the United States. Thereafter, and upon discovery of Plaintiff's subterfuge in completing his pre- and post- employment medical exams, Plaintiff's employment with Carnival was terminated.

      Following his separation from employment, Plaintiff filed a Charge of Discrimination and later this lawsuit, alleging claims arising under the Florida Civil Rights Act ("FCRA") (Count I), the Americans with Disabilities Act ("ADA") (Count II), and various state law theories, including

false imprisonment (Count III), assault (Count IV), battery (Count V), and negligent infliction of emotional distress ("NIED") (Count VI). As discussed in detail below, the Undisputed Material Facts[1] fail to support the asserted claims and otherwise demonstrate that Defendant is entitled to judgment as a matter of law as to each count of the Complaint.

Counts I and II, alleging violations of the FCRA and the ADA, respectively, fail as a matter of law for a number of reasons. First, Plaintiff was not at the time of his separation – and is not now – a *qualified* individual with a disability/handicap within the meaning of the ADA/FCRA as he does not meet the criteria necessary to work as a seafarer consistent with flag state and international law. Second, Defendant had a legitimate, non-discriminatory business reason to terminate Plaintiff's employment, namely his material misrepresentations in connection with his pre- and post- employment medical examinations. Third, even setting aside the fact that Plaintiff misrepresented his condition, Defendant was justified in refusing to continue Plaintiff's employment given his previously undisclosed medical history and following his further psychotic episode aboard the Freedom. Simply put, Defendant could not have continued to employ Plaintiff and simultaneously comply with applicable flag state and international law concerning the safe operation of vessels at sea.

Plaintiff's tort claims are similarly flawed. However, as an initial matter, this Court lacks subject matter jurisdiction over such claims. Though Plaintiff purports to assert various tort claims under state law, as the torts are all alleged to have occurred at sea and whilst Plaintiff was working as a seafarer, they must be cognizable under the Jones Act (46 U.S.C. § 688) and/or general maritime law to come within this Court's jurisdiction. Plaintiff's claims here do not, as Plaintiff alleges purely emotional injury (i.e., emotional distress, humiliation, embarrassment, and damage to his reputation) in connection with such claims, and except in limited circumstances which are not present here, neither the Jones Act nor general maritime law contemplates a cause of action for purely emotional as opposed to physical injury. But regardless, even if this Court had subject matter jurisdiction, these claims also fail for independent reasons. For instance, Plaintiff's false imprisonment claim (Count III) fails because the law is clear: restraining a person of unsound mind so that he cannot cause harm to himself or others is not unreasonable, unwarranted, or otherwise

---

[1] Simultaneous with this Motion, Defendant has filed (under seal) a Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Undisputed Material Facts").

unlawful and is therefore not actionable. Moreover, no claim for false imprisonment can lie where (as here) a defendant's actions were justified, within its legal authority, and with the plaintiff's consent. Counts IV and V for assault and battery, respectively, fail because an essential element of both causes of action is lacking, specifically, that Defendant either intended to cause fear of immediate injury or actually intended to injure Plaintiff. The Undisputed Material Facts reflect that: (i) Defendant's actions were justified given Plaintiff's behavior; (ii) Plaintiff otherwise consented to the complained-of conduct; and (iii) Defendant did not act with intent to harm Plaintiff. Finally, Count VI, NIED, fails because Plaintiff has not alleged in Count VI that Defendant was negligent in any way.

## II.     SUMMARY OF THE UNDISPUTED FACTS

Plaintiff was formerly, intermittently employed by Carnival from May 28, 2012 until July 14, 2015, working on various Carnival cruise ships around the world as a Pro DJ. (Undisputed Material Facts, ¶ 1.) Various international laws require that seafarers, like Plaintiff, regardless of their regular job duties, meet certain physical requirements such that they are able to perform all routine *and* emergency duties on an as needed basis. (Undisputed Material Facts, ¶ 2.) Therefore, upon hire and every two years thereafter, Carnival employees are required to undergo an extensive medical examination, referred to as a pre-employment medical examination or "PEME." (Undisputed Material Facts, ¶ 3.) As part of the PEME process, Carnival requires employees to complete a medical history form and to disclose certain relevant conditions whether currently existing or existing at any point in the past which may bear on the employee's fitness for duty at sea. (*Id.*)[2] For obvious safety reasons and in order to comply with international law, every employee must be declared "fit" for duty consistent with international guidelines and receive a certificate for service at sea before embarkation. (*Id.*)

Despite clear indication on the form that a failure to disclose would be grounds for termination, when Plaintiff applied for a job with Carnival in 2012, he failed to disclose on his medical history form the fact that he had previously suffered a severe, acute episode of psychosis resulting in his hospitalization. (Undisputed Material Facts, ¶ 7.) And, when Plaintiff underwent

---

[2] While Plaintiff has attempted to argue that each PEME was a mere "update" of the last, and simply to advise of new medical information since the last PEME, that argument is not supported by record evidence. Indeed, there is no limiting language on the form from which Plaintiff (or a fact-finder) could reasonably draw such a conclusion.

his next required PEME two years later, in April 2014, he again failed to disclose (and/or deliberately misrepresented) his medical history and condition. (Undisputed Material Facts, ¶ 9.) Carnival relied on the misrepresentations in Plaintiff's 2012 and 2014 medical history forms in permitting him to work on its cruise ships world-wide. (Undisputed Material Facts, ¶¶ 10-11.)[3]

On May 11, 2015, just a few weeks prior to boarding the Carnival Freedom in Galveston, Texas, and unbeknownst to Carnival, Plaintiff admitted himself to Henderson Behavioral Health ("Henderson") in Pompano Beach, Florida for psychiatric care. (Undisputed Material Facts, ¶ 13.) There, Plaintiff reported experiencing insomnia, mood disorder, and paranoid delusions. (Undisputed Material Facts, ¶ 14.) Notwithstanding, and without disclosing this episode or his serious and declining mental state to Carnival, Plaintiff boarded the Freedom on Saturday, May 23, 2015 to begin an approximately two week voyage aboard that vessel. (Undisputed Material Facts, ¶ 15.)

While on board, Plaintiff's altered mental state quickly became apparent and caused a significant disruption. (Undisputed Material Facts, ¶ 16.) On the first day of his second week aboard the Freedom, Mr. Timberlake was nowhere to be found at the start of his shift, resulting in a ship-wide search by security and the Cruise Director. (Undisputed Material Facts, ¶¶ 17-19.) Plaintiff was eventually found in a guest area, watching a movie and talking with a female guest, and upon questioning immediately began exhibiting strange behavior, claiming to be a guest, himself, and refusing to go to the security office. (Undisputed Material Facts, ¶ 19.) Thereafter, very reluctantly and after much persuasion, Plaintiff was escorted by security to the ship's security office, then the Hotel Director's office, and then to the medical center to be evaluated by a physician, who – despite Plaintiff's denials – suspected underlying psychiatric problems and recommended a full psychiatric assessment upon return to a U.S. port. (Undisputed Material Facts, ¶¶ 22-24.) The next day, Plaintiff's erratic behavior worsened, marked by his purposefully flooding his cabin, making multiple and repeated 911 calls to report that ISIS was on board the ship, referring to a ship physician as an ISIS member, packing a bag and requesting to disembark whilst

---

[3] Plaintiff also purposefully misrepresented his condition to a subsequent employer. (Undisputed Material Facts, ¶ 45). Such action serves to completely discredit any argument by Plaintiff that his failure to disclose to Carnival his prior psychological history was because he thought he was only "updating" his prior PEME, or that his failure to give honest answers about taking medications and having a history of mental illness to the ship physician was because he "assumed they knew."

in the middle of the ocean, and claiming there was smoke in the nightclub and attempting to make a run for it past security guarding his door. (Undisputed Material Facts, ¶¶ 27-35.)

Due to the severity of Plaintiff's continued outbursts and behavior (enumerated in great detail in the Undisputed Material Facts), including becoming combative with ship leadership and then violent with ship security, Plaintiff was restrained by security. (Undisputed Material Facts, ¶ 35.) After Plaintiff attempted to injure himself by banging his head/face against the wall and the floor, Plaintiff was sedated for his own safety and the safety of those around him. (*Id.*) And, after spending a night in the brig, wherein his strange behavior only continued, Plaintiff remained in the ship's medical center under the supervision of shipboard nurses and physicians until the ship's return to port in Galveston. (Undisputed Material Facts, ¶¶ 36-39.) During this time, Carnival was in contact with Plaintiff's mother (whom Plaintiff identified to Carnival as his emergency contact), who revealed for the first time to Carnival (via a shipboard physician) that Plaintiff had suffered a similar episode at the age of 18 for which he was hospitalized. (Undisputed Material Facts, ¶¶ 38-39.)

Plaintiff's employment was terminated several weeks following his disembarkation from the Freedom, after records were collected from the ship and from Henderson and it was determined that Plaintiff had made material misrepresentations on his medical history forms concerning his mental health. (Undisputed Material Facts, ¶¶ 42-43.) Regardless, Plaintiff could not have continued in Carnival's employ as international guidelines governing the physical and mental health of seafarers instruct that a single severe episode of psychosis renders one unfit for duty for a period of two years, and multiple severe episodes can disqualify a person from working at sea for a minimum of five years following the last episode, if not permanently. (Undisputed Material Facts, ¶¶ 44.)

### III.   MEMORANDUM OF LAW

#### A.   Standard for Summary Judgment

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *J.P.M. v. Palm Beach Cnty. Sch. Bd.*, 916 F. Supp. 2d 1314, 1319 (S.D. Fla. 2013) (citations omitted). "The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it

believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Accordingly, "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). *See also Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.") (citation omitted).

Importantly, "Rule 56(c) mandates the entry of summary judgment" if it is shown that the plaintiff has failed to and cannot produce sufficient, competent evidence to support **"an element essential to"** the plaintiff's case. *Celotex*, 477 U.S. at 322 (emphasis added). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-323. Because, in the instant case, competent evidence establishing essential elements of the asserted claims is entirely lacking and the Undisputed Material Facts otherwise disprove such essential elements, Plaintiff's claims fail as a matter of law and final summary judgment should be entered in favor of Defendant.

> **B.  Summary Judgment Should be Entered in Favor of Defendant on Plaintiff's ADA (Count II) and FCRA (Count I) Disability Discrimination Claims.**[4]

Summary judgment should be entered in favor of Defendant on Plaintiff's ADA and FCRA claims because: (1) the ADA/FCRA are preempted in this circumstance and, even if not preempted, Plaintiff is not a "qualified individual" with a disability; (2) Defendant had a legitimate, non-discriminatory business reason for terminating Plaintiff's employment; and (3) Defendant was justified in refusing to continue Plaintiff's employment given his medical history and following his further psychotic episode aboard the Freedom, which rendered him unfit for service at sea.

---

[4] Florida courts construe the FCRA in conformity with the ADA. *Lenard v. A.L.P.H.A. 'A Beginning' Inc.*, 945 So. 2d 618, 621 (Fla. 2d DCA 2006). Accordingly, the same analysis applies to both Counts I and II of the Complaint.

1.  **The ADA/FCRA Are Preempted, And, Regardless, Plaintiff Is Not A "Qualified Individual" With A Disability.**

    *a.  The ADA/FCRA Are Preempted By International Law.*

In 1991, the ADA was amended to reflect that employers are exempt from Title I of the ADA if compliance would run afoul of the law of the country where the workplace is located. To this end, 42 U.S.C. § 12112(c)(1) states:

> It shall not be unlawful under this section for covered entity to take any action that constitutes discrimination under this section with respect to an employee in a workplace in a foreign country [i.e., aboard a foreign-flagged vessel] if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

Moreover, as noted by the Supreme Court in *Spector v. Norwegian Cruise Lines, Ltd.*, 545 U.S. 119, n. 9 (2005) (citing 42 U.S.C. § 2000e-1(b) and 42 U.S.C. §12112(c)(1)), a case involving application of the ADA to a foreign-flagged cruise ship, federal statutes of the United States, including the ADA, **should not** be interpreted to regulate foreign persons or conduct if such regulation conflicts with international law. It follows that, as each of Carnival's cruise ships, including the Freedom, fly under foreign flags, international and flag state[5] law governing the physical requirements and medical examination standards for seafaring employees (like Plaintiff) preempt the ADA in the event of a conflict.

The STCW

The International Convention on Standards Training Certification and Watchkeeping for Seafarers, 1978 (as amended) ("STCW"), which has been ratified by the U.S., the Bahamas, Panama, and most other flag states, is one such governing international law. The STCW establishes basic requirements for training, certification, and watchkeeping for seafarers on an international level. It requires that all seafarers be provided with training to ensure they are aware of the hazards of working on a vessel and can respond in an emergency. In that regard, the STCW prescribes minimum standards which countries are obliged to meet or exceed. Regulation 1/9(1), Medical Standards, provides that "[e]ach Party shall establish standards of **medical fitness for seafarers**" and procedures for the issuance of a medical certificate in accordance with the provisions of the regulation and of section A-I/9 of the STCW Code." Subsection (3) similarly provides that "[e]very

---

[5] A "flag state" is the nation under whose laws a commercial vessel is registered or licensed. In this case, the flag state was Panama. (Undisputed Material Facts, ¶ 13.)

seafarer holding a certificate issued under the provisions of the Convention, who is serving at sea, **shall also hold a valid medical certificate** issued in accordance with the provisions of this regulation and of section A-I/9 of the STCW Code." *Id.* (emphasis added).

Importantly, Section A-I/9 of the STCW provides that "[t]he standards of physical and medical fitness established by the Party shall ensure that seafarers satisfy" certain criteria, including they seafarers "have the physical capability… to fulfil all the requirements of the basic training," and "**have no medical condition, disorder or impairment that will prevent the effective and safe conduct of their routine and emergency duties on board**." *See* Section A-I/9(2.1, 2.3) (emphasis added); *see also* 46 C.F.R. 11.202 (requiring that seafarers are required to complete the basic safety training requirements of the STCW). In accordance with the STCW, **all** of Carnival's regular seafaring employees, must complete familiarization and basic safety training and all have emergency duties. (Undisputed Material Facts, ¶¶ 2-3.)

### The Maritime Labour Convention

The Maritime Labour Convention (2006) ("MLC") is an international treaty setting *minimum* global standards to ensure decent working and living conditions of seafarers. The MLC was unanimously adopted by the delegates of the International Labour Organization ("ILO")[6] (including the U.S.) in 2006 and has since been ratified by 65 countries (including Panama). Standard A1.2.1 of the MLC requires that all seafarers "**hold a valid medical certificate attesting that they are medically fit to perform the duties they are to carry out at sea**," which includes the aforementioned emergency duties under the STCW.  Guideline B1.2.1 provides that flag states should "follow the ILO/WHO Guidelines for Conducting Pre-sea and Periodic Medical Fitness Examinations for Seafarers, including any subsequent versions, and any other applicable international guidelines published by the International Labour Organization, the International Maritime Organization or the World Health Organization." The 2013 ILO/IMO Guidelines on the Medical Examinations of Seafarers (the "Guidelines") are presently the official "subsequent version," and therefore, govern under the circumstances here.[7]

Appendix B of the Guidelines includes "Table B-I/9: Assessment of minimum entry level and in-service physical abilities for seafarers," which states that medical examiners should make sure the seafarer **"[d]oes not have a defined impairment or diagnosed medical condition that reduces ability to perform emergency duties essential to the safe operation of the vessel."** Emergency duties include "all standard emergency response situations such as abandon ship or firefighting as well as the procedures to be followed by each seafarer to secure personal survival."

Appendix E of the Guidelines, titled "Fitness criteria for common medical conditions," is designed to assist medical examiners in determining whether certain medical conditions preclude work at sea. This section of the Guidelines instructs that in cases of mood/affective disorders (including anxiety) (diagnosis code F32-38), even one acute episode renders the seafarer "incompatible with reliable performance of routine and emergency duties safely or effectively" until symptom free. The Guidelines provide that an individual suffering from mood/affective disorders could not be medically cleared until at least *two years after a severe*

---

[6] The ILO is a United Nations agency composed of 185 of the 193 UN member states.  It is charged with setting international labor standards for workers, including seafarers.

[7] The Guidelines can be accessed at the following url: https://www.ilo.org/sector/Resources/codes-of-practice-and-guidelines/WCMS_174794/lang--en/index.htm.

48365700;3                                                        9

*episode* (or one year after a minor episode) and only if the medical examiner can effectively exclude the possibility of a recurrence and confirm that any medication used to treat the condition would not have impairing effects on the seafarer's ability to perform emergency duties. (Undisputed Material Facts, ¶ 5.)

Appendix E of the Guidelines further instructs that following a single episode of psychosis (diagnosis code F20-31) without provoking factors or more than one episode with or without provoking factors an individual is temporarily unfit for duty at sea – and therefore cannot be medically cleared to work as a seafarer - for a period of years following the last acute episode. Where, however, an individual has suffered multiple episodes and requires a medication regimen, in order to exclude the likelihood of recurrence for a seafarer performing duties at sea and beyond coastal waters, the Guidelines provide that the individual cannot be medically cleared *until at least five (5) years have passed since the end of the last episode*, and provided the individual has no residual symptoms and has required no medication during the most recent two years.  (Undisputed Material Facts, ¶ 5.)

In this case, due to his severe psychotic episode while on board the Freedom, and his history of same, as well as his diagnosis with mood disorder and psychosis, a qualified medical examiner would not be able to find that Plaintiff is "fit" for service at sea consistent with the Guidelines. (Undisputed Material Facts, ¶¶ 5, 44-45.) As such, Plaintiff cannot meet an essential function of the job of a seafarer. And, Defendant would be in violation of international and flag state law if it continued to employ Plaintiff under the circumstances. As such, even assuming *arguendo* there could be a violation of the ADA in this circumstance (which is denied), Defendant cannot be held to answer for a violation of the ADA where compliance with the ADA would result in violation of applicable international law. *See Spector*, 545 U.S. at n. 9; 42 U.S.C. § 12112(c)(1).

### b. Plaintiff Is Not A "Qualified Individual."

To establish a claim for disability discrimination, Plaintiff would need to establish that: (i) he suffers from a disability; (ii) he is an otherwise "qualified individual;" and (iii) he was subjected to unlawful discrimination because of his disability. *See Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Richio v. Miami-Dade Cnty.*, 163 F. Supp. 2d 1352, 1360 (S.D. Fla. 2001); 42 USC § 1211(8) (defining "qualified individual" as an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). While he arguably

suffers from a disability/handicap, Plaintiff cannot establish that he was a "qualified individual" and further that he was subjected to unlawful discrimination because of his disability.

Of utmost important here, District Courts have routinely held that an employee (like Plaintiff) who is unable to obtain a job-required medical certificate is not a "qualified individual" within the meaning of the ADA, and therefore cannot maintain an ADA discrimination claim. *See, e.g., Toliver v. City of Jacksonville*, 2017 WL 1196637, at *10 (M.D. Fla. Mar. 31, 2017) (holding that defendant satisfied its burden of proving a legitimate, non-discriminatory reason for terminating employee based on his failure to take and pass a required test); *Hunter v. Santa Fe Protective Servs., Inc.*, 822 F. Supp. 2d 1238, 1246–47 (N.D. Ala. 2011) (finding a legitimate reason for termination where candidates for security guard positions were medically unable to take and pass a physical agility test as required by the employer's contract)*; Gilliland v. Air Line Pilots Ass 'n Intern.,* 741 F. Supp. 2d 1334, 1341 *aff'd* 396 Fed. Appx. 655 (N.D. Ga. 2009) (holding that pilot who lacked a First Class Airman Medical Certificate, and thus was disqualified from working as a commercial airline pilot, and who could not obtain the certification with any reasonable accommodation, was not a "qualified individual" within meaning the ADA and could not maintain claim for discrimination); *Rayha v. United Parcel Service, Inc.,* 940 F. Supp. 1066, 1069 (S.D. Tex. 1996) (holding that employee was not qualified to perform his duties of clerk position where he failed a mandatory medical examination, and thus could not be certified to wear respiratory equipment as required by OSHA regulations); *Prado v. Continental Air Transport Co., Inc.,* 982 F. Supp. 1304, 1306-07 (N.D. Ill. 1997) (holding that applicant who failed to pass physical examination for Department of Transportation certification was not qualified for position of driver for transportation company and, thus, company did not deny him employment in violation of the ADA).

Further, Plaintiff cannot demonstrate that he is a "qualified individual" because, to do so, he "must produce evidence demonstrating that he 'satisfied [his] employer's objective qualifications.'" *Santillana v. Florida State Court System*, 2011 WL 722765, at *18 (M.D. Fla. Feb. 23, 2011) (granting summary judgment to employer and finding plaintiff unqualified for position where she was unable to manage subordinates, which ultimately caused disruptions in the efficient operations of her department) (citing *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 769 (11th Cir. 2005)); *Daniels v. Hale*, 350 Fed. Appx. 380, 385 (11th Cir. 2009) (affirming summary judgment for employer and finding plaintiff unqualified for position where

objective evaluations evidenced that she was unable to perform her job duties); *MackMuhammad v. Cagle's Inc.*, 379 Fed. Appx. 801, 804 (11th Cir. 2010) (affirming summary judgment for employer where employee could not meet demands of position); *Oliver v. TECO Energy, Inc.*, 2013 WL 6836421, No. 8:12-CV-2117-T-33TBM, at *6-7 (M.D. Fla. Dec. 26, 2013) (granting summary judgment for employer on ADA claim where employee with a mental impairment could not establish she was "qualified" because she could not conform to employer's behavior requirements).

Here, Plaintiff was only able to obtain a certificate of service at sea by virtue of his repeated misrepresentations to Carnival and, it is undisputed that Plaintiff cannot now obtain a valid certificate for service at sea consistent with the Guidelines, so as to render him "fit" to perform his duties as a seafarer. (Undisputed Material Facts, ¶¶ 5, 44-45.) Indeed, Plaintiff acknowledged this fact, admitting at his deposition that subsequent to being released from Carnival, he made similar misrepresentations to another cruise line as he knew that he would not be hired if he disclosed the truth of his condition. (Undisputed Material Facts, ¶¶ 45.) As Plaintiff cannot legitimately obtain a certification that he is fit to work as a seafarer, nor could he with any conceivable reasonable accommodation, Plaintiff cannot properly be considered a "qualified individual."[8] For this reason alone, Plaintiff's claims ADA/FCRA fail.

### 2. Defendant Had A Legitimate, Non-Discriminatory Business Reason For Terminating Plaintiff's Employment.

Plaintiff's discrimination claims also fail because Defendant had a legitimate non-discriminatory reason for terminating Plaintiff's employment – Plaintiff's repeated misrepresentations concerning his medical condition on required medical history forms. As set

---

[8] Significantly, 42 U.S.C. § 12113(a) provides:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

*Id.* Here, the requirement of a valid certification of fitness for service at sea is clearly job-related and consistent with business necessity.

forth on those forms, a failure to truthfully answer questions and disclose known medical conditions is grounds for termination. (Undisputed Material Facts, ¶¶ 7, 9.) While Plaintiff did disclose in connection with his initial PEME in 2012 that he had suffered from anxiety and insomnia (by providing a doctor's note stating that he had been treated for anxiety and insomnia, both of which were represented to have resolved), he **never** disclosed his history of psychosis or related hospitalization.[9] (Undisputed Material Facts, ¶¶ 7-8.) Further, Plaintiff misrepresented his condition when speaking with physicians aboard the Freedom. (Undisputed Material Facts, ¶ 24.)

The discovery of these misrepresentations is unquestionably a legitimate, non-discriminatory reason both to terminate Plaintiff's employment and not to offer Plaintiff future employment. Indeed, making material misrepresentations and omissions on employer-required forms, as Plaintiff did here, has routinely been found to constitute a legitimate, non-discriminatory reason for the termination of employment. *See Schoonover v. Schneider Nat. Carriers, Inc.*, 492 F. Supp. 2d 1103, 1143 (S.D. Iowa 2007) (granting summary judgment in favor of defendant/employer because providing false statements in a medical questionnaire "is a legitimate and nondiscriminatory reason for termination"); *Alexander v. Sonny's Real Pit Bar-B-Q*, 3, 2016 WL 9488722, at *8 (M.D. Fla. July 20, 2016), *aff'd*, 701 Fed. Appx. 931 (11th Cir. 2017) (affirming summary judgment for employer, concluding that employer "presented a legitimate, non-discriminatory reason for why ([employee's] employment was terminated – Plaintiff falsified her employment application"); *Gilroy v. Bentsen*, 1996 WL 116071, at *3 (M.D. Fla. Mar. 12, 1996) (recognizing that "the legitimate, nondiscriminatory reason for Plaintiff's discharge was Plaintiff's misleading statements contained on his employment application").

Moreover, compounding Plaintiff's repeated dishonesty in completing employer-required forms, Plaintiff showed exceedingly poor judgment in boarding the Freedom with knowledge that he was in need of immediate psychiatric care, recklessly endangering himself, his fellow crew members, and Carnival's passengers. And, further, his behavior on board the Freedom (even if associated with his condition) would have been more than enough to justify his termination. *See J.A.M. v. Nova Southeastern University, Inc.*, 646 Fed. Appx. 921, 926 (11th Cir. 2016)

---

[9] That Plaintiff was hired notwithstanding his disclosure of anxiety and insomnia reflects that Carnival does not employ a blanket policy of discriminating against individuals with mental illness and did not discriminate against Plaintiff. If Carnival's goal was to discriminate, Plaintiff would not have been hired in the first place.

(recognizing that an employer need not excuse misconduct even if linked to a mental disability); *Foley v. Morgan Stanley Smith Barney, LLC*, 2013 WL 795108, at *6, No. 0:11-CV-62476 (S.D. Fla. Mar. 4, 2013) (granting summary judgment for employer on ADA claim, finding that employer did not terminate employee based on his disability but rather based on employee's removal of a computer in violation of company policy, despite employee's claim that he took a computer in violation of company policy "when he was in the midst of a psychotic episode (a manifestation of his bipolar disorder) and thought [his employer] was spying on him through his computer"); *Oliver*, 2013 WL 3836421 at *6-7 (recognizing that "the law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability" and that an employer need not tolerate violence, threats of violence, or other misconduct "even if the employee claims that a disability caused the misconduct") (citation omitted); *Howard v. Steris Corp.*, 866 F. Supp. 2d 1279, 1295 (M.D. Ala. 2012) (recognizing that "even if hindsight later reveals the employee's disability caused the misconduct, the employer has no duty to go back and retroactively excuse the misconduct").

Thus, under the circumstances, Defendant had multiple legitimate reasons beyond Plaintiff's misrepresentations to terminate Plaintiff's employment. But, based on Plaintiff's misrepresentations alone, any reasonable employer in Carnival's position would have done the same. And, significantly, Plaintiff has failed to identify any similarly situated individual outside of his protected class who engaged in similar misconduct and was not terminated. As a matter of well-established law, absent a comparator who was treated more favorably then he was treated, which Plaintiff has failed to produce, Plaintiff's claims of discrimination under the ADA/FCRA fail as a matter of law. *See Sumerlin v. AmSouth Bank,* 242 Fed. Appx. 687, 690 (11th Cir. 2007) (holding that employee must prove existence of similarly-situated employees who were treated more favorably "to prevent courts from second-guessing a reasonable decision by the employer"). For this additional reason, summary judgment should be entered in Defendant's favor on Plaintiff's ADA and FCRA claims.

### 3. Defendant's Refusal To Continue Plaintiff's Employment Was Justified As A Matter Of Business Necessity.

Finally, setting aside his blatant misrepresentations and poor judgment and behavior, Defendant was justified in refusing to continue Plaintiff's employment given his medical history

(including multiple acute episodes of psychosis) and following his further psychotic episode aboard the Freedom, which rendered him unfit for service at sea consistent with the Guidelines. (Undisputed Material Facts, ¶ 5, 43-45.) Consistent with the Guidelines, where, as here, an individual has suffered multiple episodes of psychosis, the individual cannot be medically cleared until at least five (5) years have passed since the end of the last episode, and provided the individual has no residual symptoms and has required no medication during the most recent two years. Accordingly, assuming he had no further issues and was not medication dependent, the earliest Plaintiff could possibly be reengaged would be June 2019.

      **C.**    **Summary Judgment Should Be Entered In Favor Of Defendant On Plaintiff's State Law Tort Claims.**

As an initial matter, summary judgment should be entered in favor of Defendant on all of Plaintiff's state law tort claims – false imprisonment (Count III), assault (Count IV), battery (Count V), and NIED (Count VI) – as this Court lacks subject matter jurisdiction over such claims. The United States Supreme Court has recognized that the Jones Act provides the exclusive recovery for personal injury claims by seafarers against their employers. *Miles v. Apex Marine,* 498 U.S. 19, 29, 111 S.Ct. 317 (1990) (recognizing that "the Jones Act establishes a uniform system of seamen's tort law parallel to that available to employees of interstate railway carriers under FELA"). And, it has been found that tort claims which do not involve physical peril and for which plaintiffs seek recovery for purely emotional injuries, as are set forth in Counts III through VI of the Complaint, are generally not cognizable under either the Jones Act or general maritime law. *Richards v. Royal Caribbean Cruises, Ltd.*, 118 F. Supp. 2d 150, 151-153 (D.P.R. 1999) (finding that seaman's claim for "false imprisonment" was not actionable under the Jones Act where it did not result in a cognizable physical injury and seaman only alleged "injuries of humiliation and emotional distress" and further recognizing that "false imprisonment is not the type of traditional maritime tort which general admiralty law embraces"); *Wiora v. Harrahs Illinois Corp.*, 68 F. Supp. 2d 988, 994-997 (N.D. Ill. 1999) (granting summary judgment in favor or employer on seafarer's negligent infliction of emotional distress and invasion of privacy claims where no physical injuries were alleged). As emotional injury (without any physical manifestation whatsoever) – which injury Plaintiff's counsel has previously described as "garden variety" emotional distress - is all that is alleged by Plaintiff in connection with his claims for assault, battery, false imprisonment, and negligent infliction of emotional distress, Defendant submits that

summary judgment should be entered in Defendant's favor on each of Plaintiff's tort claims.[10]

However, even assuming this Court were to find that it has subject matter jurisdiction, the Undisputed Material Facts conclusively demonstrate that Plaintiff cannot prove even the basic elements of such claims. As a threshold matter, all of Plaintiff's state law tort claims fail because Plaintiff consented to the conduct underlying such claims. Specifically, Plaintiff agreed to be bound by Carnival's Seafarer's Manual, which states that the "seafarer *shall* submit for medical, mental health and dental health testing requested by [Defendant] including but not limited to… psychological testing and analysis." (emphasis added). (Undisputed Material Facts, ¶¶ 23.)  As a matter of law, having consented to the submission of medical, mental health and psychological testing, Plaintiff cannot be said to have been the victim of: (i) a deprivation of his liberty by false imprisonment, (ii) assault and battery by an unlawful and *unwanted* touching, and (iii) emotional distress by negligent means in connection with related testing and treatment. Moreover, each of Plaintiff's state law tort claims fail for additional and independent reasons, as set forth below.

### 1. False Imprisonment

Count III of Plaintiff's Complaint asserts that Defendant unlawfully detained Plaintiff in his cabin thereby depriving him of his liberty, causing him emotional distress, humiliation, embarrassment and damage to his reputation. (*See* Complaint, ¶¶ 37-40.) However, the Undisputed Material Facts establish that Plaintiff was of unsound mind during his alleged "imprisonment," that Defendant acted within its legal authority in requiring that Plaintiff stay in his cabin, and that Defendant's actions were otherwise justified.  (Undisputed Material Facts, ¶¶ 13-40.)

Under Florida law, false imprisonment is "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty." *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th DCA 2015) (quoting *Johnson v. Weiner*, 19 So. 2d 699, 700 (1944)).  The cause of action includes four elements: "(1) the unlawful detention and deprivation of liberty of a person, (2) against the person's will, (3) without legal authority or color of authority and (4) which is unreasonable and unwarranted under the circumstances." *Id.*

---

[10] Further, in contrast to tort claims brought pursuant to Florida law, Jones Act claims must be commenced within three years after the cause of action arose.  46 U.S.C. §3106.  Accordingly, to the extent arising under the Jones Act, Plaintiff's claims should have been brought no later than June 2018 (three years after the day he was disembarked from the Freedom).  This action was not filed until September 2018.  As such, if deemed to arise under the Jones Act, Plaintiff's claims are nonetheless time-barred.

Here, the Undisputed Material Facts disprove the second, third, and fourth elements.

Setting aside the issue of consent which is addressed above, it is well-established that restraining a person of unsound mind, like Plaintiff, so that he cannot cause harm to himself or others is neither unreasonable, nor unwarranted, nor unlawful and is, therefore, not actionable. *See Furrh v. Arizona Board of Regents,* 676 P.2d 1141, 1144-1146 (Ariz. Ct. App. 1983) (recognizing "that where a person is a danger to himself or others because of his mental condition, that is lawful to restrain him so long as necessary until other lawful measures can be followed" and further that "[i]ntentional acts done out of necessity to prevent harm to one or more persons are not actionable so long as they are reasonable"); *Marx v. Hartford Accident and Indem. Co.,* 321 F.2d 70, 71 (5th Cir. 1963)[11] (affirming verdict in favor of defendant on false imprisonment claim where plaintiff's "mental processes were so impaired that she was unable to think rationally"); *Blackman v. Rifkin,* 759 P.2d 54, 58 (Colo. App. 1988) (affirming judgment for the defendants on false imprisonment claims because plaintiff's "condition justified the [defendants'] actions in keeping her in the emergency room in order to prevent further harm to herself or to others"); *Leding v. Eastern Oklahoma Medical Center*, 932 P.2d 40, 41 (Ok. Civ. Ct. App. 1996) (recognizing that "taking reasonable actions to assist someone who is manifesting delusional mental illness and is engaged in life-threatening behavior . . . furthers an interest of social importance by helping and protecting such an individual" and is, therefore, privileged). Given his psychotic, turned combative, then violent behavior, and the fact that these events occurred at sea, Carnival had no reasonable choice but to restrain and confine Plaintiff, both for his own safety and the safety of his fellow crew members and the thousands of passengers on board the Freedom. Accordingly, Plaintiff's claim fails as a matter of law.

### 2. Assault and Battery

Similar to his false imprisonment claim, summary judgment should be entered in Defendant's favor on Plaintiff's assault (Count IV) and battery (Count V) claims because an essential element of both causes of action – that Defendant either intended to cause fear of immediate injury, or intended to actually injure Plaintiff – are indisputably not present here. Rather, the Undisputed Material Facts reflect that: (i) Defendant's actions were justified given Plaintiff's behavior; (ii) Plaintiff consented to the complained-of conduct; and (iii) Defendant did

---

[11] *Marx* is binding pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

not act with intent to harm Plaintiff.

Under Florida law, a cause of action for assault requires: (1) that the defendant either intended to cause fear of immediate injury or intended to actually cause injury; (2) that the defendant's apparent present ability to inflict injury caused the plaintiff to reasonably fear injury; and (3) that the defendant's conduct created an appearance that injury was imminent. *Sullivan v. Atl. Fed. Sav. & Loan Ass'n.,* 454 So. 2d 52, 54 (Fla. 4th DCA 1984); *Lay v. Kremer,* 411 So. 2d 1347, 1349 (Fla. 1st DCA 1982). Similarly, battery requires a showing that: (1) the defendant intended to make contact with the plaintiff; (2) the defendant made contact with the plaintiff; and (3) the contact was harmful or offensive. *Sullivan* 454 So. 2d at 54-55 (emphasizing that "[t]he defendant must have done some positive and affirmative act . . . which must cause, and **must be intended to cause**, an **unpermitted** contact") (emphasis added).

For both assault and battery, the defendant must actually **intend** to cause harmful or offensive consequences. *Spivey v. Battaglia*, 258 So. 2d 815, 816-17 (Fla. 1972); *Colony Ins. Co. v. Barnes*, 189 Fed. Appx. 941, 943 (11th Cir. 2006) (dismissing complaint for failure to allege that the tortfeasor "intended to create a well-founded fear of imminent peril, or that anyone had a well-founded fear of imminent peril"). Here, the Undisputed Material Facts fail to prove that Defendant **intended** to cause fear of an injury, or an actual injury, to Plaintiff. (Undisputed Material Facts, ¶ 23.) To the contrary, the Undisputed Material Facts (¶¶ 16-40) establish that Defendant's actions were justified, and taken in order to prevent, rather than inflict, injury on Plaintiff.  As such, Plaintiff's claims fail as a matter of law.

### 3. NIED

Plaintiff's final cause of action – Count VI for negligent infliction of emotional distress is equally flawed and ripe for summary judgment, as Defendant is not alleged in Count VI to have been *negligent* in any way. Florida law is clear that before a plaintiff can recover damages for emotional distress caused by the *negligence* of another, the emotional distress suffered must flow from physical injuries the plaintiff sustained in an impact. *See R.J. v. Humana of Fla., Inc.*, 652 So. 2d 360, 362 (Fla. 1995). Of note, the emotional distress must be correlated directly to the defendant's liability for the underlying physical impact.  In *St. Joseph's Hosp. v. Cowart*, for example, plaintiff's distress and anxiety were attributable to the impact of a spider bite (a physical impact), but because the hospital was not negligent for the spider bite, the plaintiff could not

recover damages for any distress or anxiety flowing from the bite, physical or emotional. 891 So. 2d 1039, 1043 (Fla. 2d DCA 2004).

In Count VI, Plaintiff does not allege any negligent conduct by Defendant (or, indeed, any physical injury resulting therefrom). Rather, in Count VI Plaintiff only alleges intentional conduct by Defendant resulting in purported "emotional distress, humiliation, embarrassment and damages to his reputation." (Compl. ¶¶ 48-50.) The alleged *intentional* conduct (which, as discussed above, does not support a cause of action against Defendant under any of the tort theories Plaintiff has asserted) also does not support a claim for *negligent* infliction of emotional distress. *See Cowart*, 891 So. 2d at 1043. In the absence of an alleged negligent act, summary judgment is warranted with respect to Count VI.

## IV.   CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order granting summary judgment in its favor and against Plaintiff on all causes of action set forth in the Complaint, awarding Defendant its reasonable attorneys' fees and costs, and granting Defendant such further and additional relief as the Court deems just and proper.

Date:   April 25, 2019					Respectfully submitted,

By: */s/ Melissa S. Zinkil*
James S. Bramnick (Florida Bar No. 190994)
Melissa S. Zinkil (Florida Bar No. 0653713)
**AKERMAN LLP**
Three Brickell City Centre, Suite 1100
98 SE Seventh Street
Miami, FL 33136
Phone:  (305) 374-5600/Fax: (305) 374-5095
Email:  james.bramnick@akerman.com
Email:  melissa.zinkil@akerman.com
Email:  vivian.lopez@akerman.com
Email:  michelle.reynolds@akerman.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document, is being served this day on all counsel and parties of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Melissa S. Zinkil*
Melissa S. Zinkil
Florida Bar No. 0653713

## SERVICE LIST

Anthony V. Falzon
ANTHONY V. FALZON P.A.
12000 Biscayne Boulevard, Suite 702
Miami, FL 33181
Phone: (786) 703-4181/Fax: (786) 703-2961
E-Mail: tony@anthonyfalzon-law.com

*Counsel for Plaintiff*

*Service via CM/ECF*