UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-24250-CIV-COOKE/GOODMAN

AARON TIMBERLAKE,

    Plaintiff,

vs.

CARNIVAL CORPORATION,
A foreign for-profit corporation,

    Defendant.

_____/

**ORDER**

This case is presently before the Court on Defendant's Motion for Summary Judgment (ECF No. 30). The Court has reviewed the record and the arguments of the parties and, for the foregoing reasons, concludes that Defendant's Motion for Summary Judgment (ECF No. 30) should be **GRANTED**.

## I. BACKGROUND

Plaintiff Aaron Timberlake ("Timberlake") was employed by Defendant Carnival Corporation ("Carnival") as a disc jockey ("DJ") beginning in May 2012 until he was terminated in July 2015. (Def.'s Statement of Material Facts ("DSMF") ¶1.)

The International Convention on Standards Training Certification and Watchkeeping for Seafarers, 1978 (as amended) ("STCW") and The Maritime Labour Convention (2006) ("MLC") are a set of published guidelines—ratified by most flag states including the U.S. and Panama— instructing that all regular seafarers must meet certain physical requirements such that they are able to perform their job duties in order to be declared "fit" for duty at sea (the "Guidelines")[1]. (DSMF ¶ 2.) Accordingly, all Carnival employees are required to undergo a comprehensive pre-employment medical exam ("PEME") upon hire and every two years thereafter. (DSMF ¶ 3.) The PEME requires Carnival employees to complete a medical history

---

[1] The Guidelines were published to "assist shipowners to establish criteria that will lead to equitable decisions about who can safely and effectively perform the routine emergency duties at sea provided." (PSMF ¶ 2; Khoury Dep. 42:14-53:11)

1

form and disclose certain relevant conditions, including mood/affective disorders. (DSMF ¶ 5.) The Guidelines state that medical examiners must ensure that the seafarers "[d]oes not have a defined impairment or diagnosed medical condition that reduces ability to perform emergency duties essential to the safe operation of the vessel." (DSMF ¶ 4; Khoury Aff. at ¶ 8.) The Guidelines further instruct that a single severe episode of psychosis is incompatible with reliable performance of routine and emergency duties safely or effectively for a minimum of two years after the episode. (DSMF ¶ 5; Khoury Aff. at ¶ 9.)

On April 30, 2012, Timberlake completed a personal history form in connection with his PEME. (DSMF ¶ 6.) Timberlake did not disclose any mental or nervous disorders, anxiety/depression, or sleeping disorders. (Khoury Aff. ¶ 10, Ex. 3.) Timberlake also denied ever having been hospitalized for any such condition and for any medical reason whatsoever. (*Id.*) In completing the form, Timberlake certified that his representations were true and correct to the best of his knowledge and belief. (*Id.*) He further acknowledged that Carnival would rely on his representations in determining whether he was eligible for employment and, therefore, any false representations would be grounds for termination. (*Id.*) Timberlake also submitted a letter from his doctor advising that Timberlake had a past history of "anxiety and insomnia" but that the condition had been resolved and medical treatment had been discontinued. (Khoury Aff. ¶ 10, Ex. 4.) Timberlake was subsequently hired by Carnival after completing the first PEME.

Two years later, Timberlake underwent a second PEME in which he again denied any medical or nervous disorders, anxiety/depression, sleeping disorders or being hospitalized. (Khoury Aff. ¶ 12, Ex. 5.) Timberlake also certified and acknowledged that his representations in the second PEME were accurate and that any false representations would be grounds for termination. (*Id.*)

Timberlake's employment with Carnival was generally uneventful. However, unbeknownst to Carnival, two weeks before embarking on Carnival Freedom to work as a DJ for two back-to-back seven-night cruises, Timberlake admitted himself to a behavioral health facility where he complained of insomnia, mood disorder, and paranoid delusions. (DSMF ¶¶ 13-14.) Timberlake subsequently boarded Carnival Freedom on May 30, 2015 without disclosing his stay at the behavioral health facility. (*Id.* at ¶ 15.) Later that same day, Timberlake failed to appear for his scheduled shift. (*Id.* at ¶ 17.) When Carnival staff finally located Timberlake, he was found socializing with a passenger and "acting strangely." (*Id.* at ¶ 18;

Misquitta Dec. at Ex. A.) Timberlake asserted that he was a paying guest and complied with security staff's request that they escort him to the security office but refused to enter the security office. (*Id.* at ¶ 19; Misquitta Dec. at Ex. A.) Timberlake eventually agreed go to the Hotel Director's office and met with the Staff Captain and the Human Resources Director. (*Id.* at ¶ 20; Misquitta Dec. at Ex. A.) There, Timberlake's strange behavior persisted. He insisted that he was entitled to a day off and threatened to file a lawsuit. (*Id.*) Timberlake submitted to a drug and alcohol test, which were both negative. (*Id.*) Timberlake also submitted to a medical examination during which he denied any past medical, surgical, psychological, or other significant history and denied taking any medication. Based on Timberlake's behavior, the examining physician suspected psychiatric problems but did not believe that Timberlake was a danger to himself or others. Accordingly, Timberlake was escorted to his cabin and monitored for the night. (*Id.* at ¶ 24; Misquitta Dec. at Ex. A.) The next day, Timberlake again met with the Staff Captain and Human Resources Director and was advised that he would be relieved from his duty and safeguarded in his cabin, but he would be permitted to dine in the mess hall with other employees under the supervision of security. (*Id.* at ¶¶ 25-26.) Timberlake's strange behavior worsened. Upon returning to his cabin after the meeting, Timberlake repeatedly flipped the light switch on and off, he also caused a flooding in his cabin by blocking a drain with a towel while unceasingly running water from the faucet. (*Id.* at ¶ 27.) Consequently, Timberlake was escorted back to the ship's medical center for a second medical evaluation. Timberlake was belligerent and refused to submit to the second medical exam. The examining doctor observed that Timberlake appeared to be experiencing a psychotic episode and recommended that he be escorted home and that his family be informed of his condition. (*Id.* at ¶ 27.) Timberlake was escorted back to his cabin. There, security discovered and confiscated a bottle containing several tablets of Citalopram (an anti-depressant), which was not prescribed to Timberlake, but he admitted to ingesting them. Still, Timberlake's strange behavior persisted, so much so that he became aggressive with security resulting in security calling the cruise's staff doctor to examine Timberlake again. Timberlake again refused to submit to a medical examination and accused the doctor of drugging him and called her an ISIS member. (*Id.* at ¶¶ 30-33.) Timberlake's aggression towards the cruise's staff escalated throughout the day and climaxed when he shouted that there was smoke on board the ship and attempted to run out of his cabin ripping a metal handrail off the wall. As a result, Timberlake was restrained and hand-cuffed. Timberlake was ultimately sedated and placed in the ship's brig

3

when he proceeded to bang his head and face against the wall and the floor. (*Id.* at ¶¶ 34-35.)

By the next day, Timberlake's strange behavior had still not subsided. A staff doctor spoke with Timberlake's mother who revealed for the first time that he had suffered a similar episode in his teenage years and had been hospitalized as a result. (*Id.* at ¶¶ 37-38.) On June 1, 2015, Timberlake was transferred from the brig to an isolation room in the medical center, where he remained until the ship returned to port on June 6, 2015. During his time in the isolation room, Timberlake was monitored and permitted to speak with his mother. (*Id.* at ¶¶ 39-40.) Once the ship docked, Timberlake was taken by ambulance to a hospital for a full psychiatric evaluation. (*Id.* at ¶ 41.) Timberlake was ultimately diagnosed with a mood disorder and psychosis. (*Id.*)

Carnival terminated Timberlake's employment after records collected from the ship and the behavioral facility revealed that Timberlake had made misrepresentations on his medical history forms concerning his mental health. (*Id.*)

Timberlake subsequently filed this lawsuit asserting claims under the Florida Civil Rights Act, §§ 760.01–.11, Fla. Stat. (2005) (the "FCRA"), the Americans with Disabilities Act (the "ADA") 42 U.S.C. § 12101, *et seq*, false imprisonment, assault, battery, and negligent infliction of emotional distress. Specifically, Timberlake contends that Carnival discriminated against him on account of his mood disorder, in violation of the FCRA and ADA. (*See generally Compl.*) Carnival has filed a motion for summary judgment on all of Timberlake's claims.

## II.   LEGAL STANDARD

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to

4

materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id*.

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

### III. DISCUSSION

#### a. Plaintiff's FCRA And ADA Claims

##### 1. Plaintiff Is Not "Disabled"

As a general rule, a physical or mental impairment is not automatically a "disability" under the ADA. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565–66 (1999); *Wimberly v. Sec. Tech. Group, Inc.*, 866 So.2d 146, 147 (Fla. 4th DCA 2004). Under the ADA, an individual is "disabled" if he: (a) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) [has] a record of such impairment; or (c) [is] regarded as having such an impairment. 42 U.S.C. § 12102(2). *See also Albertson's*, 527 U.S. at 565; *Wimberly*, 866 So.2d at 147.

The term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the

5

condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2005). In determining whether an impairment "substantially limits" a major life activity, courts are instructed to consider the nature and severity of the impairment, the expected duration of the impairment, and the expected long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2).

"Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). With respect to the major life activity of working, the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

Mood disorders have been held to constitute a mental impairment. *See Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996) (recognizing that depression constitutes a mental impairment). *See also, Glowacki v. Buffalo Gen. Hosp.*, 2 F.Supp.2d 346, 351 (W.D.N.Y.1998) (noting that bipolar disorder has been recognized as an impairment under the ADA). However, merely having a mental impairment does not render an individual "disabled" under the ADA. *See Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1155 (11th Cir. 2005) (emphasizing that impairment must substantially limit a major life activity to rise to the level of a disability under § 12102(2)(A)). A plaintiff must also show that his mood disorder substantially limits one or more of his major life activities. *Id.* That determination does not follow automatically from plaintiff's diagnosis of mood disorder alone; instead, it must be made "on a case-by-case basis." *Id.*

Timberlake would have to provide evidence from which a jury could reasonably find that his mood disorder substantially impairs at least one major life activity. Here, Timberlake uses broad strokes in expressing the severity of his illness and explains that although he had been treated for a mood disorder in the past, he had been cleared to work by various medical professionals and insists that he medically qualified to return to work. (Plaintiff's Opp. To Mot. Summ. J. at 13). Indeed, Timberlake testified that he can continue his work as a DJ provided he remains on his treatment medication. (*Id.*) Assuming that procuring and sustaining gainful

employment is a major life activity, Timberlake has arguably demonstrated that he himself does not believe that his mood disorder substantially impairs one major life activity, instead he presents evidence that his disorder is of limited consequence or restrictions on his work life.

Timberlake fails to provide evidence lending credence to the proposition that he may be disabled under the ADA. Accordingly, plaintiff has not created a genuine issue of fact concerning whether he is disabled under the ADA.

### 2. Plaintiff is not a "qualified individual."

The ADA was designed to prohibit discrimination against disabled individuals. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1227, (11th Cir. 2005). The terms of the statute provide that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Timberlake contends that he is qualified under the ADA and that Carnival discriminated against him because of his mood disorder when it terminated his employment. (*See generally* Compl.)

The crux of the issue here is whether Timberlake is a "qualified individual" with a disability as defined by the FCRA/ADA. If Timberlake is a "qualified individual," Carnival was required to offer him accommodations for his disability and was prohibited from terminating him because of his disability. If Timberlake is not a "qualified individual," the protections of the FCRA/ADA are not triggered. As discussed herein, this Court concludes that Timberlake has not established that he is a "qualified individual" under the FCRA/ADA.

To establish a claim for disability discrimination under either the FCRA or the ADA, Plaintiff would need to establish that: (i) he suffers from a disability; (ii) he is an otherwise "qualified individual;" and (iii) he was subjected to unlawful discrimination because of his disability. *See Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Richio v. Miami-Dade Cnty.*, 163 F. Supp. 2d 1352, 1360 (S.D. Fla. 2001).

A "qualified individual" is an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 1211(8). "Essential functions" are the fundamental job

7

duties of the employment position," but do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "In other words, the Plaintiff must show that [he] can perform the essential functions of [his] job without accommodations, or, failing that, show that [he] can perform the essential functions of [his] job with a reasonable accommodation." *Rabb v. Sch. Bd. Orange Cty.*, 590 Fed.App'x 849, 850 (11th Cir. 2014).

Undisputed evidence in the record establishes that while Timberlake was experiencing his psychotic episode he was unable to perform as a DJ. During his psychotic episode Timberlake experienced an alternate reality in which he believed he was a paying guest and attempted to interact with other guests. He became belligerent and erratic when Carnival employees tried to subdue him, so much so that Carnival confined Timberlake to his cabin and eventually to the ship's brig. He destroyed property, he screamed at staff, and attempted to injure himself. *See Hardy v. Sears, Roebuck & Co.*, 1996 WL 735565 (N.D.Ga.1996) (noting that "abusive and threatening behavior by an employee ... may dictate that [the] employee cannot perform the essential functions of a given job"); *Ray v. Kroger Co.*, 264 F.Supp.2d 1221, 1228 (S.D.Ga.2003) (finding that employee with Tourette's Syndrome was not qualified for job as utility clerk as a result of his inability to perform his duties without blurting out offensive words in front of customers).

Despite all of the evidence in the record concerning Timberlake's inappropriate behavior, he argues that he is qualified to perform his essential duties as a DJ because (1) a psychiatrist cleared him to return to work, (2) his disability can be controlled by medication, (3) he was able to perform his job for three years without incident. (Pl.'s Opp. To Def.'s Mot. For Summ. J. at 13). Timberlake's psychotic episodes are seemingly sporadic and unpredictable, which arguable renders him unable to perform his duties as a DJ. *Daniels v. Hale*, 350 Fed. Appx. 380, 385 (11th Cir. 2009) (affirming summary judgment for employer and finding plaintiff unqualified for position where objective evaluations evidenced that she was unable to perform her job duties); *MackMuhammad v. Cagle's Inc.*, 379 Fed. Appx. 801, 804 (11th Cir. 2010) (affirming summary judgment for employer where employee could not meet demands of position); *Oliver v. TECO Energy, Inc.*, 2013 WL 6836421, No. 8:12-CV-2117-T-33TBM, at *6-7 (M.D. Fla. Dec. 26, 2013) (granting summary judgment for employer on ADA claim where employee with a mental impairment could not establish she was "qualified" because she could not conform to employer's behavior requirements).

The undisputed evidence establishes that Timberlake's inappropriate behavior while on

8

board the ship was disruptive and problematic for all involved. Due to his severe psychotic episode while on board the ship, and his history of the same, as well as his diagnosis with mood disorder and psychosis, it is difficult to conclude that a qualified medical examiner would deem Timberlake "fit" for service at sea. Indeed, by his own admission, Timberlake testified that he was unable to perform any functions of his job while suffering from a psychotic episode while on board. (Pl.'s Dep. 123:1-13, Ex. 2.) That Timberlake was employed for several years without issue is simply insufficient to permit a reasonable jury to conclude that Timberlake was able to perform the essential functions of his job, when all other evidence in the record is to the contrary. Further, Timberlake's argument that he is "qualified" to perform his duties because he can control his condition with medication is unavailing because Timberlake's medical history suggests the very opposite—even with medication and treatment Timberlake has experienced repeated and unpredictable psychotic episodes in the past, including while working. The mood disorder Timberlake suffers from is incurable and recurrence rates are uncertain, which lends credence to the proposition that Timberlake cannot be deemed "qualified" under the FCRA/ADA.

  b. **Defendant Had A Legitimate, Non-Discriminatory Business Reason For Terminating Plaintiff's Employment**

Even if Timberlake were able to establish a *prima facie* case, Carnival would still be entitled to summary judgment. Courts are instructed to apply the *McDonnell Douglas*[2] burden-shifting framework in cases where there is no direct evidence of discrimination. Under this burden-shifting framework, the plaintiff initially has the burden of establishing a *prima facie* case of disability discrimination. *See Collado v. United Parcel Service Co.,* 419 F.3d 1143, 1149-1150 (11th Cir. 2005) (applying *McDonnell Douglas* framework to ADA case involving circumstantial evidence). Once plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the termination. *Cleveland v. Home Shopping Network*, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (citing *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)).

If defendant meets this burden, plaintiff must produce some evidence that defendant's

---

[2] The *McDonnell Douglas* burden-shifting framework typically applies in cases where there is no direct evidence of discrimination. Timberlake asserts that there is direct evidence of discrimination and points to an email produced in this matter that demonstrates that Carnival had decided to terminate Timberlake one month in advance. However, the Court remains unconvinced that this is direct evidence of discrimination based solely on Timberlake's mood disorder. Accordingly, the McDonnel Douglas burden-shifting framework applies to this case.

articulated reason for his termination is "unworthy of credence," and a pretext for discrimination, in order to survive summary judgment. *Id.*

Once the defendant proffers sufficiently probative, credible, non-discriminatory reasons for its actions, as it has in the instant case, plaintiff must come forward with specific evidence tending to show that such reasons were a pretext for discrimination. *See Willis v. Conopco, Inc.*, 108 F.3d 282, 287 (11th Cir. 1997) (finding summary judgment proper where ADA plaintiff failed to offer evidence to raise an inference that defendant's articulated explanation for her termination was pretext for discrimination); and *Lewis v. Zilog*, 908 F.Supp. 931, 952 (N.D.Ga. 1995) (concluding that plaintiff was not entitled to relief under the ADA where she failed to present evidence that defendant's legitimate, non-discriminatory reasons for her termination were pretextual).

The MLC and the ILO are international treaties setting forth the minimum global standards as it applies to the living conditions of seafarers[3]. They are guidelines promulgated for conducting pre-sea and periodic medical fitness of seafarers[4]. Accordingly, both the MLC and the 2013 ILO/IMO Guidelines on the Medical Examinations of Seafarers[5] (the "Guidelines") are applicable and govern the circumstances here.[6]

Standard A1.2.1 of the MLC requires that all seafarers "hold a valid medical certificate attesting that they are medically fit to perform the duties they are to carry out at sea." To that end, Appendix B of the Guidelines titled "Assessment of Minimum Entry Level and In-Service Physical Abilities for Seafareers," states in relevant part that medical examiners should ensure that the seafarer "does not have a defined impairment or diagnosed medical condition that reduces ability to perform emergency duties essential o the sage operation of the vessel." Emergency duties include "all standard emergency response situations such as abandon ship or

---

[3] The MLC was unanimously adopted by the delegates of the International Labour Organization ("ILO") (including the U.S.) in 2006 and has since been ratified by 65 countries (including Panama).
[4] Guideline B1.2.1 provides that flag states should "follow the ILO/WHO Guidelines for Conducting Pre-sea and Periodic Medical Fitness Examinations for Seafarers, including any subsequent versions, and any other applicable international guidelines published by the International Labour Organization, the International Maritime Organization or the World Health Organization."
[5] The 2013 ILO/IMO Guidelines on the Medical Examinations of Seafarers (the "Guidelines") are presently the official "subsequent version," and therefore, govern under the circumstances here.
[6] Defendant argues that the ADA/FCRA are preempted by international law—namely the International Convention on Standards Training Certification and Watchkeeping for Seafarers, The Maritime Labour Convention, and the guidelines contained therein. The Court is not prepared at this juncture to determine whether the aforementioned treaties preempt the ADA/FCRA. However, the Court is convinced that the treaties and the guidelines are particularly instructive in this matter as they prescribe the minimum standards and basic requirements for training, certification, and watchkeeping of seafarers. Accordingly, the international treaties and any corresponding guidelines are applicable in the analysis.

firefighting as well as the procedures to be followed by each seafarer to secure personal survival." Further, Appendix E of the Guidelines titled "Fitness Criteria for Common Medical Conditions" instructs that in cases of mood/affective disorders, even one acute episode renders the seafarer "incompatible with reliable performance of routine and emergency duties safely or effectively" until symptom free. The Guidelines further provide that an individual suffering from mood/affective disorders cannot be medically cleared until at least two years after a severe episode (or one year if the episode is a minor one) and only if the medical examiner can effectively exclude the possibility of recurrence and confirm that any medication used to treat the condition would not have impairing effects on the seafarer's ability to perform emergency duties.

Here, Carnival has proffered at least three legitimate non-discriminatory reasons for terminating Timberlake's employment: 1) Timberlake's failure to disclose his medical history; 2) Timberlake's misrepresentations regarding his pre- and post- employment medical examinations; and 3) Timberlake's inappropriate behavior at work resulting from his psychotic episode, including losing his temper with supervisors, destroying property, refusing to subject to medical examinations, and generally engaging in conduct not befitting an employee. (DSMF at ¶¶ 25-34.) Each of these legitimate, non-discriminatory reasons for Timberlake's termination is well-supported by testimony and documentary evidence in the record. (DSMF at Exs. 2-7, 9-10, and attached affidavits at Exs. A-O.)

Timberlake states that the reasons cited by defendant were pretextual because there were no questions on the form asking him about his mental condition[7]. However, the record evidence establishes that Timberlake failed to disclose his mental conditions twice on the pre-employment forms (Khoury Aff. at Ex. 3.) Timberlake also failed to disclose his mental condition even during in-person medical examinations. (*Id.*) Had Timberlake disclosed his mental condition it is highly unlikely that he would have been cleared as "fit" for duty pursuant to the aforementioned guidelines. Thus, the discovery of Timberlake's misstatements is a

---

[7] Timberlake insists that he did not complete Carnival's pre-employment form because he had completed a similar form in May 2012 for a job as an art gallery associate with Carnival (the "May Application"), which asked only one specific question about his mental health. Timberlake suggests that when he applied for the job as a DJ he submitted the May Application to Carnival in lieu of Carnival's pre-employment application. Carnival has produced two forms dated 2012 and 2014 which demonstrate that Timberlake *did* in fact complete Carnival's employment application forms. Both of Carnival's forms asked questions about Timberlake's mental health and specifically asked whether Timberlake had ever experienced any of the following: (1) mental or nervous disorder; (2) anxiety/depression; (3) sleeping disorders; (4) eating disorders; and (5) alcohol and drug abuse. Timberlake failed to disclose his mood disorder and attested that his statements were true and accurate.

legitimate, non-discriminatory reason to terminate his employment. *See Schoonover v. Schneider Nat. Carriers, Inc.*, 492 F.Supp. 2d 1103, 1143 (S.D. Iowa 2007) (granting summary judgment in favor of defendant/employer because providing false statements in a medical questionnaire "is a legitimate and nondiscriminatory reason for termination"); *Alexander v. Sonny's Real Pit Bar-B-Q*, 3, 2016 WL 9488722, at *8 (M.D. Fla. July 20, 2016), *aff'd*, 701 Fed. Appx. 931 (11th Cir. 2017) (affirming summary judgment for employer, concluding that employer "presented a legitimate, non-discriminatory reason for why ([employee's] employment was terminated – Plaintiff falsified her employment application"); *Gilroy v. Bentsen*, 1996 WL 116071, at *3 (M.D. Fla. Mar. 12, 1996) (recognizing that "the legitimate, nondiscriminatory reason for Plaintiff's discharge was Plaintiff's misleading statements contained on his employment application"); *Foley v. Morgan Stanley*, 2013 WL 795108, at *6 (S.D Fla. Mar. 4, 2013) (granting summary judgment for employer on ADA claim, finding that employer did not terminate employee based on his disability but rather based on employee's removal of a computer in violation of company policy, despite employee's claim that he took a computer in violation of a company policy "when he was in the midst of a psychotic episode (a manifestation of his bipolar disorder) and thought [his employer] was spying on him through his computer); *Oliver*, 2013 WL 63836421 at *6-7 (recognizing that "the law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability" and that an employer need not tolerate violence, threats of violence, or other misconduct "even if the employee claims that a disability caused the misconduct") (citation omitted); *Howard v. Steris Corp.*, 866 F. Supp. 2d 1279, 1295 (M.D. Ala. 2012) (recognizing that "even if hindsight later reveals the employee's disability caused the misconduct, the employer has no duty to go back and retroactively excuse the misconduct").

The record evidence shows that Carnival had a legitimate non-discriminatory reason for terminating Timberlake. Accordingly, summary judgment must be granted to Carnival in this regard.

    c. **Plaintiff's Tort Claims**

Timberlake asserts various tort claims—false imprisonment, assault, battery, and negligent infliction of emotional distress. Each claim stems from Timberlake's confinement to his cabin and the ship's brig during his psychotic episode. Notably, Timberlake does not allege

that he was physically injured by any Carnival employees. Rather, Timberlake alleges that as a result of his confinement he has suffered and continues to suffer emotional distress, humiliation, embarrassment, and damage to his reputation. (Compl. ¶¶ 40, 44, 47, 50.) The Court considers each tort claim in turn.

### 1. Plaintiff Has Not Adequately Pled A Claim for False Imprisonment

To prevail on a false imprisonment claim, the plaintiff must establish four elements: "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So.2d 1266, 1268 (Fla. 4th DCA 2006).

It is well-established that a person may be arrested and detained without judicial or quasi-judicial proceedings where there is an urgent necessity to prevent immediate injury to such person or others. *See Furrh v. Arizona Bd. of Regents,* 676 P.2d 1141, 1144-46 (Ariz. Ct. App. 1983)(recognizing "that where a person is a danger to himself or others because of his mental condition, that is lawful to restrain him so long as necessary until other lawful measures can be followed" and further that "[i]ntentional acts done out of necessity to prevent harm to one or more persons are not actionable so long as they are reasonable"); *Marx v. Hartford Accident and Indem. Co.,* 321 F.2d 70, 71 (5th Cir. 1963) (affirming verdict in favor of defendant on false imprisonment claim where plaintiff's "mental processes were so impaired that she was unable to think rationally"); *Blackman v. Rifkin,* 759 P.2d 54, 58 (Colo. App. 1988) (affirming judgment for the defendants on false imprisonment claims because plaintiff's "condition justified the [defendants'] actions in keeping her in the emergency room in order to prevent further harm to herself or to others"); *Leding v. Eastern Oklahoma Medical Center*, 932 P.2d 40, 41 (Ok. Civ. Ct. App. 1996) (recognizing that "taking reasonable actions to assist someone who is manifesting delusional mental illness and is engaged in life-threatening behavior . . . furthers an interest of social importance by helping and protecting such an individual" and is, therefore, privileged).

Carnival's actions were reasonable under the circumstances. The undisputed evidence indicates that Timberlake was experiencing a psychotic episode during which he was unable to control his behavior. His behavior escalated to the point that he banged his head and face against a wall even while constrained in handcuffs. Timberlake was clearly of unsound mind

and incapable of exercising rational self-control. Thus, confining Timberlake was justified under the law and reasonably necessary to protect him against himself and others onboard the ship from the dangers incident to his condition. Accordingly, Timberlake's false imprisonment claim fails.

2. **Plaintiff Has Not Adequately Pled A Claim For Assault And Battery**

Carnival argues that Timberlake's claims for assault (Count IV) and battery (Count V) should be dismissed because Carnival's actions were reasonable under the circumstances, Timberlake consented to the complained-of conduct, and Carnival did not act with the requisite intent.

An assault is "the apprehension of immediate, harmful or offensive contact with the plaintiff's person, caused by acts intended to result in such contacts, or the apprehension of them, directed at the plaintiff or a third person." *Wynn v. City of Lakeland*, 727 F.Supp.2d 1309, 1315 (M.D.Fla. 2010) (quoting *Doe v. Evans*, 814 So.2d 370, 379 (Fla. 2002)). Thus, the apprehension of immediate harmful or offensive conduct is an essential element of the tort of assault. *Wynn*, 727 F.Supp.2d at 1315. The Complaint contains no allegations that Timberlake was in fear of an immediate harm. Thus, Timberlake has failed to plead an essential element of a claim for assault.

A battery is some form of harmful or offensive contact. *Loos v. Club Paris, LLC*, 684 F.Supp.2d 1328, 1335 (M.D.Fla. 2010). Battery requires a showing that: (1) the defendant intended to make contact with the plaintiff; (2) the defendant made contact with the plaintiff; and (3) the contact was harmful or offensive. *Sullivan v. Atl. Fed. Sav. & Loan Ass'n.*, 454 So. 2d 52, 54-55 (Fla. 4th DCA 1984). Timberlake agreed to be bound by Carnival's Seafarer Manual, which states that at Carnival's request all seafarers must submit to medical and mental health testing, including psychological testing and analysis. (DSFM ¶ 23). In other words, Timberlake consented to "contact" by Carnival at its request. Thus, Timberlake did not experience an unwanted touching. Consequently, having failed to plead an essential element of a battery claim, Timberlake's battery claim against Carnival must be dismissed.

3. **Plaintiff Has Not Adequately Plead A Claim For Negligent Infliction Of Emotional Distress**

In Florida, the prerequisites for recovery for negligent infliction of emotional distress differ depending on whether the plaintiff has or has not suffered a physical impact from an

external force. If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself. If, however, the plaintiff has not suffered an impact, the complained-of mental distress must be "manifested by physical injury," the plaintiff must be "involved" in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must suffer the complained-of mental distress and accompanying physical impairment "within a short time" of the incident.

Timberlake does not allege that he suffered any physical injury. Rather, he claims that he has suffered and continues to suffer emotional distress, humiliation, embarrassment, and damage to his reputation. (Compl. ¶¶ 40, 44, 47, 50.) Without any allegations of a "manifested physical injury," Timberlake's negligent infliction of emotional distress claim also fails.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant's Motion for Summary Judgment (ECF No. 30) is **GRANTED.**

**DONE and ORDERED** in chambers at Miami, Florida, this 20th day of January 2020.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Jonathan Goodman, U.S. Magistrate Judge*
*Counsel of record*